UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LEON E. SWINDLER | * | CIVIL ACTION NO. 23-837 |
| | * | |
| VERSUS | * | SECTION: "G"(1) |
| | * | |
| KILOLO KIJAKAZI, COMMISSIONER | * | JUDGE NANNETTE JOLIVETTE BROWN |
| OF THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| *********************************** | * | |

REPORT AND RECOMMENDATION

The plaintiff, Leon E. Swindler, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") awarding disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 423, for a closed period beginning May 18, 2018, and ending January 19, 2022. The matter has been presented for decision by the parties' briefs in accordance with the Supplemental Rules for Social Security Actions. (Rec. Docs. 7, 9). For the following reasons, IT IS RECOMMENDED that the decision of the Commissioner finding Mr. Swindler's disability ended on January 19, 2022, be reversed and that Mr. Swindler be awarded benefits accordingly.

**Procedural Background**

Mr. Swindler applied for DIB on December 22, 2020, asserting a disability onset date of May 18, 2018. He alleged the following illnesses, injuries, or conditions: back problems and nerve problems. On July 6, 2021, his claim was denied by the state agency. Mr. Swindler obtained counsel and applied for reconsideration, which was denied on February 22, 2022.

Mr. Swindler then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 11, 2022. On September 19, 2022, the ALJ issued a partially favorable decision, finding Mr. Swindler disabled beginning on May 18, 2018, but also finding that Mr.

1

Swindler's disability ended on January 19, 2022. Mr. Swindler timely appealed to the Appeals Council, which denied review on November 17, 2022.

On March 7, 2023, Mr. Swindler filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 5, 6). Mr. Swindler filed his brief in support of his appeal, and the Commissioner filed her brief in response. (Rec. Docs. 6, 7).  No reply was filed. The action is ripe for decision pursuant to Rule 5 of the Supplemental Rules for Social Security Actions. Mr. Swindler is represented by counsel.

### Evidence in the Record

*1. Hearing Testimony*

Mr. Swindler was 42 years old at the time of the hearing before the ALJ on August 11, 2022.

Prior to suffering a back injury on the job, Mr. Swindler worked as an oilfield mechanic with R&R Rig Service. R. at 45. The date of his injury—May 18, 2018—is his alleged disability onset date. R. at 44. Following the accident, he had a hard time doing anything, even getting out of bed. R. at 47. He experienced pain that felt like lightning going down his legs about 90% of the day. Id.  He testified that he felt about 10% improvement in pain following a discectomy in August or September of 2018. R. at 47-48.

Mr. Swindler returned to work for R&R in approximately December 2018 after his discectomy and worked for about four months in inside sales. R. at 44, 47. He would sell parts and pull orders, but he only worked about four or five hours a day. R. at 44. He testified that he stopped working because the amount of pain he was in and the amount of medication he had to take to make it through the day got to be too much. R. at 45. He added that the work was an hour drive

from his house and that he felt impaired driving home because of the medication. Id. He and his doctor concluded it was not safe. Id. He also said his employer felt the same way and that he was not bringing in enough money at work to cover his salary. Id.

Approximately a year after the discectomy, Mr. Swindler underwent a spinal fusion. R. at 47. He got a lot more relief from this surgery than from the discectomy. R. at 48. But he began experiencing other problems like nerve damage in his left leg. Id. He testified that he has numbness in his left leg from the knee down. Id. He testified that he still has back pain, but not as frequently as before. Id. He no longer experiences the lightning pain going down his leg. Id. Sometimes he experiences random pain in his toes, which his doctor says is normal with nerve damage. R. at 49.

Mr. Swindler takes oxycodone for pain—at least three or four times a day. R. at 49. He also takes Flexeril for inflammation and gabapentin for nerve damage. Id. He testified that he experiences severe drowsiness from his pain medication. R. at 53. He uses a cane both inside and out of the house. R. at 49. He has trouble balancing because of the numbness in his left leg. Id.

Mr. Swindler lives with his wife and three children. R. at 50. On a typical day, Mr. Swindler wakes up and grabs a coffee. Id. He can brush his own teeth and can usually dress himself. Id. He tries to help his wife get the kids ready for school. Id. After that he takes his first round of medication and goes to rest because the medication makes him extremely drowsy. R. at 51. When he gets up, he may wash some dishes. Id. He drives to pick the kids up from school, which is less than a mile away. Id. After that he takes his second round of medication and may fall asleep. Id. He tries to cook dinner two or three times a week. Id. His wife usually helps him get into the shower in the evenings. Id. Then he takes his last round of medication and tries to sleep for the night. Id.

Mr. Swindler testified that on a good day, he can probably stand for 30 minutes in one place but on a bad day he could only do so for a couple of minutes. R. at 52-53. He testified that "[a] lot of times" he has to lay down after walking any amount of distance. R. at 52. He testified that he has 10 to 15 bad days a month. R. at 53. The ALJ asked whether he could stand for about 30 minutes at a time four times in an eight-hour workday, for a total of two hours in a day. R. at 52. Mr. Swindler said it was questionable and said he could not do so every day. Id.

Vocational expert Michelle Aliff testified at the hearing. R. at 56. She classified Mr. Swindler's past work as "oil field mechanic" and "sales representative-oil field supplies and equipment" (although the sales representative job was not classified as past relevant work because of the short amount of time he performed it). R. at 56-57.

The ALJ asked the vocational expert to consider a hypothetical individual with the same age, education, and work history as Mr. Swindler who is limited to the full range of light exertional work, except that he can only stand and/or walk for a total of two hours in an eight-hour workday and he must be permitted to use a cane for ambulation. R. at 56. He can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; and can occasionally stoop, kneel, crouch, crawl, and balance when walking on narrow, slippery, or uneven surfaces. Id. He must avoid exposure to hazardous work environments such as unprotected heights and dangerous moving machinery. Id.

The vocational expert testified that such a person could not perform Mr. Swindler's past work as an oil field mechanic. Id. However, he could perform work as a cashier, Dictionary of Occupational titles ("DOT") Code 211.462-010, light exertion with an SVP of 2. R. at 57. The vocational expert explained that 3.5 to 4% of cashier positions meet the two-hour standing and walking limitation for a total of about 30,000 jobs in the United States. Id. The individual could

4

also perform the job of office helper, DOT Code 239.567-010, light exertion with an SVP of 2, and approximately 50,000 jobs in the nation. Id. And finally, the individual person could perform work as a bench assembler, known in the DOT as an assembler of small products, DOT Code 706.684-022, light exertion with an SVP of 2, and approximately 70,000 jobs in the nation. Id. The vocational expert confirmed that the number of jobs available for the last two positions also reflected a reduction from the total otherwise available to accommodate the sitting/standing limitation. R. at 58. She explained that the way she does this is to consider the jobs available for someone who has to be able to sit or stand at will. Id.

The ALJ then asked the vocational expert to alter the hypothetical to a sedentary exertion level and further reduce that to only standing and/or walking for a total of about one hour of an eight-hour workday and leaving the other limitations in place. R. at 58-59. The vocational expert testified that such a person would be less-than sedentary capacity and therefore there would be no jobs under SSA rules. R. at 59. Returning to the first hypothetical, the vocational expert testified that if the individual was off task 20% of the workday in addition to normal lunch and work breaks, the person could not perform the listed jobs and there would be no jobs available. Id.

2. *Medical Records*

Mr. Swindler began treatment at Culicchia Neurological Clinic in May 2018. On May 30, 2018, he reported to Dr. Stephen Rynick that he had been experiencing bothersome low back pain for four to six weeks that had been severe for the previous two to three weeks. R. at 857-58. Mr. Swindler could not sit or stand for more than a few minutes without severe lumbar and lumbar radicular pain to the right L5-S1 distribution with an average intensity of 10/10. Id. He was barely able to get up from lying down to go to the bathroom. Id. On examination, Mr. Swindler had a positive straight leg raise on the right but negative on the left. Id. Sensation was diminished in the

right posterior and lateral leg between the knee and the ankle. Id. Dr. Rynick reviewed the lumbar spine MRI from May 25, 2018, and noted a disc bulge at L5-S1 with lateral recess and foraminal narrowing, abutting the L5 and S1 nerve roots on the right. Id. Mild left foraminal stenosis was noted at L4-5 as well as an impression of lumbar radiculopathy. Id. Dr. Rynick arranged for transforaminal lumbar epidural injections. Id.

When Mr. Swindler followed up with Dr. Rynick on July 11, 2018, his gait was normal, but he again had a positive straight leg raise on the right. R. at 855. Dr. Rynick noted an impression of lumbar radiculopathy, markedly improved. Id. Lumbar epidural steroid injections were arranged. Id. And Mr. Swindler was released to work at light duty, limited to lift, carry, push, pull up to ten pounds. Id.

Mr. Swindler followed up with Dr. Rynick after a transforaminal lumbar epidural steroid injection on August 14, 2018, and two injections in June. R. at 648. It was noted that Mr. Swindler had good temporary relief but symptoms had returned to baseline. Id. He had severe low back pain extending to the posterior right lower extremity and no relief with conservative measures. Id. Increased intolerance to activity and significant disturbance of sleep were also noted. Id.

Mr. Swindler treated with Dr. John Steck on August 30, 2018, on referral from Dr. Rynick. R. at 853. Dr. Steck noted Mr. Swindler was experiencing fairly significant sciatica on the right to the ankle. Id. It was noted that he had excellent conservative care with activity restrictions, medications, and epidural injections two times without relief. Id. He had a positive straight leg raise on the right but was otherwise normal with normal strength, sensation, and reflexes. Id. Failed conservative care was noted and Mr. Swindler was offered a L5-S1 microscopic discectomy. Id.

On September 14, 2018, Mr. Swindler underwent a right L5-S1 foraminotomy, hemilaminectomy, and operative microscope. R. at 805. He followed up with Dr. Steck two weeks later and was restricted to lifting no greater than 10 pounds. R. at 767.

An MRI of the lumbar spine was performed on October 19, 2018, and an impression of postsurgical changes of the right L5-S1 facetectomy was noted, along with degenerative changes of the lower lumbar spine, and a 9mm oval mass of intermediate signal along the right anterior lateral aspect of the thecal sac at the L5-S1 level which could represent postsurgical fibrosis or extruded disc material and displaces the right S1 nerve root. R. at 438.

Mr. Swindler followed up with Dr. Steck on October 25, 2018. R. at 766. He reported experiencing increased pain and fever a couple of weeks earlier. Id. He was feeling better but still had back pain. Id. His x-rays looked normal. Id.

On November 8, 2018, Dr. Steck noted that Mr. Swindler had developed severe pain down his left leg, which was new. R. at 765. His back was flat and he had no fever or tenderness. Id. His neurological examination was normal, and a straight leg raise test was mildly positive. Id. He was having difficulty walking due to the severity of the pain. Id. An epidural was arranged to treat the severe radiculopathy. Id.

During Mr. Swindler's December 6, 2018, follow up with Dr. Steck, Mr. Swindler still had radiculopathy to the left leg and a lot of back pain—too much to work. R. at 764. His neurological exam was negative. Id. A month later Mr. Swindler continued to complain of significant low back pain with bilateral buttock pain. R. at 593. He reported his pain was worse with activity and partially relieved by rest. Id. He also reported a lot of pain in the morning with shooting pain in both legs. Id. Physical therapy was recommended, and he underwent physical therapy from approximately February 12, 2019, through March 12, 2019. R. at 777-99.

When Mr. Swindler followed up with Dr. Steck on March 26, 2019, he had not improved at all with therapy and continued to be miserable with severe back pain and bilateral leg pain, markedly increased with standing and walking, relieved with rest. R. at 592. On examination, he had a negative straight leg raise bilaterally.  Id. He had normal strength, sensation, and reflexes. Id. His back exam showed limited range of motion. Id. It was noted that all conservative measures had failed and surgery was discussed. Id.

Mr. Swindler underwent a L4-S1 anterior lumbar interbody fusion/posterior lumbar fusion on July 29, 2019. R. at 360. His diagnosis was lumbar stenosis with neurogenic claudication, lumbar stenosis. Id.  At his follow up appointment on August 16, 2019, Mr. Swindler complained of paresthesia and weakness in the left foot. R. at 535.

On September 14, 2019, Mr. Swindler underwent a microdiscectomy at L5-S1.[1] R. at 317-36. At his follow up with Dr. Steck on September 19, 2019, Mr. Swindler looked "really good." R. at 534. He complained of neuropathy in the left foot. Id.  Pinprick was intact, but it was noted that he "kind of guards it" and that it "really bothers him at night." Id.  It was also noted that Mr. Swindler was started on Neurontin and it helped. Id.  Mr. Swindler underwent physical therapy from approximately September 24, 2019, to November 14, 2019. R. at 465-522.

On December 16, 2019, Mr. Swindler reported to Dr. Steck that he was still experiencing numbness and weakness in the left foot. R. at 533. On exam he had 4/5 plantar dorsiflexion and decreased pinprick diffusely in the foot. Id.

Mr. Swindler returned to Dr. Rynick on December 30, 2019. R. at 531. Mr. Swindler reported continued pain extending into the left calf and foot, which had been severe and profoundly sleep disturbing and activity limiting since at least 6 months before the surgery. Id.  His back pain

---

[1] A majority of the records indicate the right side, R. at 319, 321, 336, 342, however, a Technical Report and an Interoperative Neurophysiology report indicate the left. R. at 317, 345.

had greatly improved since the surgery. Id. On examination, allodynia was noted in the left foot, with dysesthesia in the left calf. Id. Left ankle dorsiflexion was one half-grade weaker compared to the right. Id. His gait was antalgic on the left. Id. Mr. Swindler was interested in proceeding with a lumbar spinal cord stimulator implant trial. Id.

Mr. Swindler followed up with Dr. Steck on February 13, 2020. R. at 529. Dr. Steck noted that an EMG showed persistent left L5 radiculopathy. Id. Upon examination, Mr. Swindler ambulated independently, although he did use a cane. Id. His back examination was benign. Id. Dr. Steck noted that conservative care would be continued. Id.

On March 14, 2020, Mr. Swindler reported to Dr. Steck that he was at home trying to get some exercise. R. at 526. He reported he still had back and radicular pain in the legs, but it was alleviated with his medications of Percocet, Flexeril, and gabapentin. Id.

Mr. Swindler next followed up with Dr. Steck on August 27, 2020. R. at 524. He was neurologically intact. Id. X-rays show a solid arthrodesis. Id. Dr. Steck noted Mr. Swindler still had some mechanical back pain. Id. He also noted that physical therapy would be instituted, but there is no record of additional physical therapy. Id.

When Mr. Swindler next followed up with Dr. Steck on March 4, 2021, he still complained of pain down the left foot and chronic back pain and decreased mobility. R. at 828. He had not been able to do any real therapy other than exercise at home due to his dispute with workmen's compensation. Id. On neurological examination, he had 4/5 gastrocnemius and anterior tibialis on the left. Id. He also had decreased pinprick on left L5. Id. Dr. Steck noted he had a nice decompression with post-op and that the x-rays showed solid arthrodesis. Id. He encouraged physical therapy. Id.

Mr. Swindler returned to Dr. Steck on June 3, 2021. R. at 873. He was neurologically stable. Id. Dr. Steck noted that they would continue conservative care. Id. On July 21, 2021, Dr. Steck wrote a letter opining that Mr. Swindler had been made unemployable by chronic pain and his surgery, including fusion of the lumbar spine. R. at 872. He noted Mr. Swindler was left with severe pain in the back and also radiating pain into the leg. Id. There were no contemporaneous treatment notes.

Mr. Swindler followed up with Dr. Steck on September 23, 2021. R. at 877. He noted that Mr. Swindler continued to have chronic pain with some radiating pain in his left leg. Id. On exam, he continued to have some weakness in the anterior tibias, 4/5. Id. He was neurologically stable. Id. Dr. Steck noted there was no change in Mr. Swindler's overall physical condition. Id. He noted Mr. Swindler was compliant with medications. Id. He would continue to help Mr. Swindler with conservative care. Id.

During Mr. Swindler's January 20, 2022, follow up appointment, Dr. Steck noted that Mr. Swindler was "Stable. Compliant on medications." R. at 876. Dr. Steck further noted "All examination normal. General physical exam normal." Id. He noted the x-rays showed solid arthrodesis with no significant degeneration above. Id. He described Mr. Swindler as stable and determined that they would continue conservative care. Id. He recommended a walking and exercise program. Id.

Mr. Swindler returned to Dr. Steck on April 21, 2022. R. at 875. Dr. Steck noted Mr. Swindler was "[d]oing well" and neurologically intact on exam. Id. He determined they would continue on the current medications. Id.

On July 29, 2022, Dr. Steck completed a form supplied by Mr. Swindler's counsel. R. at 883-888. He reported seeing Mr. Swindler every three months and described his symptoms as low

back pain that radiates into the left leg down to the foot. R. at 883. He noted a diagnosis of lumbar spinal stenosis and described treatment as two operations including a spinal fusion and now, pain management. Id. Prognosis was guarded. Id.  He opined that Mr. Swindler's disability or impairment would last more than a year. R. at 884.  He opined that Mr. Swindler would be able to stand for 30 minutes and sit for 45 minutes to an hour. Id. He opined that Mr. Swindler is prevented from lifting and pulling heavy objects and prevented from holding objects of more than ten pounds. R. at 885. He opined that Mr. Swindler had difficulty bending, squatting, kneeling, and twisting. Id.  He described Mr. Swindler as suffering with severe low back pain and left leg pain into his foot most of the day, at a moderate to severe level. Id.  He noted that Mr. Swindler would need to lie down during the day to get relief from pain. R. at 886. He limited Mr. Swindler to reaching up above his shoulders and down to his waist frequently, limited him to reaching down to the floor rarely, and limited him to consistently being able to carefully handle objects and handle with fingers. Id.  He also opined Mr. Swindler would be limited to lifting and carrying 5-10 pounds regularly and during an eight-hour period. Id.  He opined that Mr. Swindler could not continue to work at his previous employment. R. at 887. And he opined that the disability was not likely to change. Id.  There were no contemporaneous treatment notes.

Attached to Mr. Swindler's brief, but not included in the administrative record, is a treatment note dated November 3, 2022. (Rec. Doc. 7-1, at 7). On that date, Mr. Swindler followed up with Dr. Steck. Id.  His neurologic exam was normal with respect to strength and sensation. Id. He required a cane for ambulation. Id. Mr. Swindler reported that on days when he is active with his kids, he has pain of 7-8 out of 10 or worse. Id.  He reported that after a day of activity he has significant pain in the following days and some days cannot get out of bed due to pain. Id.  Dr. Steck noted that Mr. Swindler was "stable at this time with chronic pain and disability." Id.  He

noted further that his note from January 2022 may have been "a bit misleading when [it]stated that

he was doing well. Well is a relative term and what I meant by this is that he was not deteriorating.

He had a stable disability related to his lumbar spine." Id.  Dr. Steck added that Mr. Swindler's

pain is markedly aggravated by activities such as standing and even sitting. Id.  He noted that he

did not think there was any reasonable way Mr. Swindler could be employed. Id.

Also attached to Mr. Swindler's brief and not included in the administrative record is

another form completed by Dr. Steck. Id.  at 1-6. It is dated November 10, 2022, and contains

substantially the same opinions as the July 2022 form.

### Decision of the Administrative Law Judge

The ALJ determined that Mr. Swindler meets the insured status requirements of the Act

through December 31, 2024. The ALJ found that Mr. Swindler has not engaged in substantial

gainful activity since May 18, 2018, the alleged disability onset date.

The ALJ next found that Mr. Swindler suffered from the following severe impairments

from May 18, 2018, through January 19, 2022:  degenerative disc disease of the lumbosacral spine

with stenosis and radiculopathy status post fusion, and morbid obesity. During this same period,

the ALJ found that Mr. Swindler did not suffer from an impairment or combination of impairments

that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart

P, Appendix 1. During the period from May 18, 2018, through January 19, 2022, the ALJ found

that Mr. Swindler had the residual functional capacity to perform sedentary work, except that he

was limited to standing/walking for one hour in an eight-hour workday. The ALJ determined that

during this period, Mr. Swindler could not have performed his past relevant work and that no other

jobs existed in significant numbers in the national economy that he could have performed.

Accordingly, the ALJ determined that Mr. Swindler was under a disability as defined by the Act from May 18, 2018, through January 19, 2022.

For the period beginning on January 20, 2022, the ALJ found Mr. Swindler had the same previously found impairments and that these impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that medical improvement occurred as of January 20, 2022, considering notes from a follow up appointment with his treating physician on that date and a subsequent follow up on April 27, 2022. The ALJ found that this medical improvement is related to Mr. Swindler's ability to work because, the ALJ found, there has been an increase in Mr. Swindler's residual functional capacity. The ALJ determined that beginning January 20, 2022, Mr. Swindler has had the residual functional capacity to perform light work, except that he can only stand and/or walk a total of two hours in an eight-hour workday and must be permitted to use a came for ambulation. Additionally, he can never climb ladders, ropes, or scaffolds; he can occasionally climb ramps and stairs; he can occasionally stoop, kneel, crouch, crawl, and balance when walking on narrow, slippery, or uneven surfaces; and he must avoid exposure to hazardous work environments, such as unprotected heights and dangerous moving machinery. The ALJ determined that Mr. Swindler could not perform his past relevant work. However, considering his age, education, work experience, and residual functional capacity, the ALJ found that jobs exist in significant numbers in the national economy that Mr. Swindler can perform. Accordingly, the ALJ concluded that Mr. Swindler's disability ended on January 20, 2022, and Mr. Swindler has become "not disabled" as of that date.

**Statement of Issues on Appeal**

Issue No. 1.    Whether the ALJ erred by inserting his own opinion for that of the medical expert opinions and/or failing to develop the record.

**Analysis**

**1.  Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).  This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

2.    **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id. An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

3.    **Termination of Benefits under the Act.**

Once an individual has been found disabled under the Act, the individual's disability benefits can be terminated if substantial evidence demonstrates that "(A) there has been any

medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity." Griego v. Sullivan, 940 F.2d 942, 943–44 (5th Cir. 1991) (quoting 42 U.S.C. § 423(f)). According to the applicable regulations, "Medical improvement is any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594 (b)(1). A finding that medical severity has decreased "must be based on improvement in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." Id.  A decrease in medical severity is "related to the individual's ability to work" when there has also been an increase in the claimant's "functional capacity to do basic work activities." Id.  § 404.1594 (b)(3).

The second part of the evaluation is whether the claimant is able to engage in substantial gainful activity, which is similar to the standard governing initial determinations except "that the ultimate burden of proof lies with the Secretary in termination proceedings." Griego, 940 F.2d at 944 (5th Cir. 1991). "The basis for [the] presumption [of continuing disability] is that a prior determination of disability is binding on all parties to the hearing and has a res judicata effect as to that record." Gill v. Heckler, 740 F.2d 396, 397 (5th Cir. 1984). This same standard applies both in a case where the Commissioner seeks to terminate existing benefits and a case where, as here, the Commissioner awards benefits for a closed period. See Waters v. Barnhart, 276 F.3d 716, 719 (5th Cir. 2002).

Substantial gainful activity is "work activity involving significant physical or mental abilities for pay or profit." Joseph v. Astrue, 231 F. App'x 327, 330 (5th Cir. 2007) (quoting Newton v. Apfel, 209 F.3d 448, 452 (5th Cir.2000)). "The ability to engage in substantial gainful

activity is determined through an 'objective assessment of [the] functional capacity to do basic work activities' and a consideration of vocational factors." Id. (quoting 20 C.F.R. § 404.1594(b)(5)).

**4.    Plaintiff's Appeal**.

Issue No. 1.    *Whether the ALJ erred by inserting his own opinion for that of the medical expert opinions and/or failing to develop the record.*

a. *Parties' Arguments*

Mr. Swindler challenges the ALJ's conclusion that he experienced medical improvement as of January 20, 2022, based on treatment notes of Dr. Steck dated January 20, 2022, and April 27, 2022. Mr. Swindler submits that the ALJ's determination contradicts the later opinions of Dr. Steck. Specifically, he points to a November 2022 treatment notes[2]—notes that do not appear in the administrative record and that was issued after the ALJ's decision—in which Dr. Steck explains that his note from January 2022 that Mr. Swindler was doing well was misleading because he meant that Mr. Swindler was not deteriorating. Mr. Swindler argues that the ALJ erred by rejecting the opinion of his treating physician Dr. Steck regarding his limitations. He notes that Dr. Steck has a lengthy history of treating Mr. Swindler and submits that Dr. Steck is in an excellent position to understand Mr. Swindler's impairments. Mr. Swindler argues that the ALJ merely substituted his own opinion for that of Dr. Steck. He points out that no other opinion controverts Dr. Steck's opinion. He argues that the ALJ failed to adequately explain why he did not adopt Dr. Steck's opinion. He argues further that the ALJ should have developed the record further by obtaining testimony from a medical expert or ordering a physical examination. Therefore, he insists, the ALJ's opinion must be overturned.

---

[2] As discussed above, the administrative record includes Dr. Steck's July 2022 opinion regarding Mr. Swindler's limitations, which is essentially identical to the November 2022 opinion.

The Commissioner responds that the ALJ properly considered the opinion evidence of Dr. Steck. The Commissioner points out that pursuant to the revised regulations applicable to Mr. Swindler's claim, the agency evaluates the medical opinions for persuasiveness and articulates the agency's consideration of the supportability and consistency of the opinion. Here, the Commissioner argues that the ALJ specifically articulated how persuasive he found Dr. Steck's July 2022 opinion and how she came to this finding. For example, the ALJ noted that there were no contemporaneous progress notes with the Residual Functional Capacity form completed by Dr. Steck. The ALJ found the reaching and sitting/standing limitations were inconsistent with the record after January 20, 2022, because Dr. Steck's own treatment notes did not reflect such extreme limitations. The Commissioner argues that the ALJ properly found that Dr. Steck's progress notes drafted contemporaneously with examination were more persuasive than the form he completed in anticipation of the adjudicative hearing. Further, the Commissioner argues that the ALJ properly determined that Dr. Steck's opinions regarding disability and ability to work were opinions on issues reserved to the Commissioner and were therefore not persuasive.

Furthermore, the Commissioner argues that the ALJ also relied on the administrative findings of the State agency medical consultants. Specifically, the ALJ found that both the initial consultant and the consultant on reconsideration found Mr. Swindler had the same residual functional capacity. The ALJ found these opinions persuasive for the period beginning January 20, 2022, based on the January 20, 2022, examination findings of Dr. Steck. The Commissioner insists that the state agency opinions provide substantial support for the ALJ's residual functional capacity finding. The Commissioner argues that the ALJ's residual functional capacity findings are substantially supported by clinical findings on examination, objective diagnostic testing,

including an MRI and x-rays, the January 20, 2022, medical opinion, and the prior administrative medical findings.

The Commissioner argues further that the ALJ did not err in developing the record. The Commissioner submits that the ALJ is entitled to interpret the medical evidence to determine a claimant's ability to work. The Commissioner argues that the ALJ's opinion is supported by substantial evidence and that another medical opinion was not required for the ALJ to adequately develop the record. The Commissioner insists that substantial evidence supports the ALJ's findings that Mr. Swindler experienced medical improvement as of January 20, 2022, and that this improvement was related to his ability to work.

Mr. Swindler did not file a reply brief.

b.  *Analysis*

The ALJ based his conclusion that Mr. Swindler experienced medical improvement on Dr. Steck's January 2022 and April 2022 treatment notes. Although these notes reflect normal examination findings and a stable condition, they do not differ significantly from Dr. Steck's findings prior to January 2022. For example, on June 3, 2021, Mr. Swindler was neurologically stable and conservative care was continued. R. at 873. This followed a March 4, 2021, visit where Mr. Swindler complained of pain down the left foot, chronic back pain, and decreased mobility. R. at 828. On neurological examination, he had 4/5 gastrocnemius and anterior tibialis on the left and decreased pinprick on left L5. Id.  In context, then, neurologic stability does not indicate improvement. Then later on September 23, 2021, Mr. Swindler was neurologically stable, had no change in his overall physical condition, and he was continued on conservative care. R. at 877. At that same visit, chronic pain with some radiating pain and weakness was noted. Id.  Again, stability and "no change" does not appear to reflect improvement. The next treatment record is the January

19

20, 2022, visit when Mr. Swindler was stable and would continue conservative care. In context, this cannot reasonably lead to the conclusion that Mr. Swindler had experienced medical improvement and ceased to be disabled on this date. Even the April 2022 note that Mr. Swindler was "doing well," was neurologically intact, and would continue on his current medications does not reflect any explicit improvement in Mr. Swindler's condition from that prior to January 2022. Acknowledging that the substantial evidence requires less than a preponderance of evidence, the Court is nonetheless unable to find substantial evidence supporting the ALJ's finding of medical improvement. As noted, a finding of medical improvement must be based on an improvement in symptoms, signs, and/or laboratory findings. The records cited by the ALJ simply cannot support such a finding.[3] Moreover, because the ALJ's finding of disability beginning on May 18, 2018, is res judicata, it is the Commissioner's burden to establish that Mr. Swindler can engage in substantial gainful activity. See Waters, 276 F.3d at 719; Gill, 740 F.2d at 397.

Even if the January and April 2022 treatment could be interpreted as reflecting medical improvement, in November 2022, Dr. Steck offered a clarification of his earlier notes, stating that they were a bit misleading in stating that Mr. Swindler was "doing well." Rec. Doc. 7-1, at 7. He explained this was a relative term and that he meant that Mr. Swindler was not deteriorating. Id. These notes were made during a clinical visit at which time Dr. Steck again noted that Mr. Swindler was stable, even as Mr. Swindler reported chronic activity related back pain with pain of 7-8 out of 10 with activity. Id. His neurologic examination was normal. Id.

> When new evidence becomes available after the Secretary's decision and there is a reasonable probability that the new evidence would change the outcome of the decision, a remand is appropriate so that this new evidence can be considered. To

---

[3] And consideration of Dr. Steck's July 2022 opinion further weakens the ALJ's conclusion. The ALJ's primary basis for finding an inconsistency between Dr. Steck's opinion and other evidence of record are the January and April 2022 treatment notes. But as discussed, these notes do not reflect improvement in Mr. Swindler's symptoms or reduction of his limitations. Therefore, they cannot provide a basis for discounting Dr. Steck's opinions. Of course, Dr. Steck's opinions on disability and ability to work cannot be considered because those are issues reserved to the Commissioner.

justify a remand, 42 U.S.C. § 405(g) requires that the evidence is "new" and "material" as well as a showing of "good cause" for failing to provide this evidence at the original proceedings.

Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995) (footnote omitted). "[N]ew evidence must . . . pertain to the contested time period and not merely concern a subsequently acquired disability or the deterioration of a condition that was not previously disabling." Leggett v. Chater, 67 F.3d 558, 567 (5th Cir. 1995).

Here, however, the Court finds that consideration of the "new evidence" standard and a remand is not necessary. The Commissioner's decision that Mr. Swindler experienced medical improvement as of January 20, 2022, is not supported by substantial evidence. The November 2022 evidence further supports the Court's conclusion, but is not necessary to make it. Because the Commissioner's decision is not supported by substantial evidence, it should be reversed and the Commissioner's finding that Mr. Swindler was disabled as of May 18, 2018, should remain operative.[4]

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner finding Mr. Swindler's disability ended on January 19, 2022, be reversed and that Mr. Swindler be awarded benefits accordingly.

---

[4] The Court does not come to, and therefore does not consider, Mr. Swindler's argument the ALJ should have developed the record by ordering an examination of Mr. Swindler or arranging for medical expert testimony. The Court notes that while the ALJ has a duty to "develop the facts fully and fairly" relating to an applicant's claim for disability benefits, Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995); Thorton v. Schweiker, 663 F.2d 1312, 1316 (5th Cir. 1981), the ALJ is not required to do so in a particular way. See Ford v. Sec'y of Health & Hum. Servs., 659 F.2d 66, 69 (5th Cir. 1981) (holding that the ALJ is not required to order a consultative examination "unless the record establishes that such an examination is necessary to enable the administrative law judge to render a decision." White v. Soc. Sec. Admin., 129 F. App'x 905, 906 (5th Cir. 2005) (holding that where the medical record is sufficiently developed, the ALJ is not required to obtain additional medical expert testimony).

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 17th day of October, 2023.


_____
Janis van Meerveld
United States Magistrate Judge